**THE BROWN LAW FIRM**
Timothy W. Brown, Esq. (TB 1008)
 Email: tbrown@thebrownlawfirm.net
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff*

**14 CV 9140**

**JUDGE RAMOS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELE GRAHAM TURNER 1995 REVOCABLE TRUST, JEFFREY TURNER AS TRUSTEE, DERIVATIVELY AND ON BEHALF OF AMERICAN REALTY CAPITAL PROPERTIES, INC., | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) ) |
| NICHOLAS SCHORSCH, BRIAN BLOCK, LISA MCALISTER, DAVID KAY, LISA BEESON, LESLIE D. MICHELSON, WILLIAM G. STANLEY, BRUCE D. FRANK, SCOTT J. BOWMAN, EDWARD M. WEIL, JR., SCOTT P. SEALY, SR., And WILLIAM KAHANE, | ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| And | ) ) |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., | ) ) ) |
| Nominal Defendant. | ) ) |

Case No.

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT FOR:**

**(1) BREACH OF FIDUCIARY DUTY;**
**(2) CORPORATE WASTE;**
**(3) GROSS MISMANAGEMENT; AND**
**(4) UNJUST ENRICHMENT**

**JURY TRIAL DEMANDED**

**RECEIVED** 2014 U.S.D.S.D.N.Y.

Plaintiff Jeffrey Turner, as a trustee of the Michele Graham Turner 1995 Revocable

Trust, ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal

1

Defendant  Financial Corporation ("ARCP" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Nicholas Schorsch, Brian Block, Lisa Mcalister, David Kay, Lisa Beeson, Leslie D. Michelson, William G. Stanley, Bruce D. Frank, Scott J. Bowman, Edward M. Weil, Jr., Scott P. Sealy, Sr., and William Kahane (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of ARCP, gross mismanagement, abuse of control, and unjust enrichment for her complaint against Individual Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ARCP, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by ARCP's directors and officers between February 27, 2014, inclusive, through the present (the "Relevant Period").

2.     On October 29, 2014, ARCP, one of the country's largest real estate investment trusts ("REIT"), announced that its annual report containing financial statements for the year

2013 and quarterly reports for the first two quarters of 2014 filed with the SEC could not be relied on and needed to be restated.

3.      ARCP announcement disclosed that the financial statements overstated the Company's adjusted funds from operations ("AFFO") from the first and second-quarters of 2014 by $23 million and understated the Company's net loss.

4.      ARCP's CEO David Kay, admitted that second-quarter's results were misstated intentionally "in order to conceal the error from the first quarter."

5.      On the same day of ARCP's announcement, the SEC opened an investigation into ARCP's accounting.

6.      Two days later, it was reported in the media that the FBI and the U.S. Attorney in New York opened a criminal probe as a result of ARCP's admissions of its accounting fraud.

7.      Many analysts ceased to provide coverage or  ratings of ARCP on October 29, and the following day Standard & Poor's disclosed that it may cut the Company's rating to junk status.

8.      By November 3, after many brokerages refused to sell non-publicly traded REITs owned by ARCP's chairman, former CEO, controller, and founder, Defendant Schorsch, 2014 RCS Capital Corp. ("RCS"), a company that had agreed to purchase assets belonging to ARCP, Cole Capital Advisors Inc., for $700 million, reneged on the deal.

9.      ARCP Director Edward G. Rendell ("Rendell") admitted that ARCP's false statements were connected to ARCP's employees' bonuses.  The Wall Street Journal reported that the "accounting errors resulted from incorrect accruals related to bonus payments made across a broad swath of the company, including to management..."

- 3 -

10.     Within about 4 months prior to the exposure of ARCP management's fraud, 4 Company directors, Defendants Weil, Kahane, Bowman, and Sealy, resigned. Less than a month beforehand, chairman and founder, Defendant Schorsch, resigned from his other position at the Company as CEO.   The day before the fraud was exposed, Defendant Block, the Company's CFO, executive vice president, treasurer, and secretary, and Defendant McAlister, the Company's chief accounting officer and senior vice president, resigned at the request of the Audit Committee.

11.     The Individual Defendants breached their fiduciary duties by causing the Company to issue false and misleading statements that overstated the Company's AFFO and understated the Company's net loss.

12.     The Individual Defendants breached their fiduciary duties by causing the Company to issue the aforementioned false and misleading statements in order to receive lucrative bonuses that were directly related to the false statements.

13.     The Individual Defendants breached their fiduciary duties by causing the Company to lack adequate internal and financial controls during the Relevant Period. Additionally, the Individual Defendants caused ARCP to fail to disclose the same.

14.     ARCP's lack of adequate internal controls has caused the Company to make the aforementioned false and misleading statements and to allow the management to receive lucrative bonuses in connection with the false and misleading statements.

15.     These breaches of fiduciary duty have subjected the Company to multiple federal securities fraud class action lawsuits, to an SEC investigation, to a criminal probe by the FBI and the U.S. Attorney in New York, to the termination of the sale of assets worth $700 million, to the

need to undertake internal investigations, to losses due to the unjust enrichment of Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses connected to Defendants' false and misleading statements that were made intentionally, and will cost the Company going forward millions, if not billions, of dollars.

16.     As a result of Defendants' false and misleading statements, the price of ARCP common stock traded at artificially inflated prices throughout the Relevant Period.

17.     As a result of Defendants' false and misleading statements and illicit scheme, the price of ARCP stock, plummeted from the closing price of $12.38 on October 28, 2014 to close at $8.79 per share on November 12, 2014, with ARCP thus losing almost $4 billion in market value.

18.     In light of the Individual Defendants' conduct, which has subjected the Company, ARCP's chairman Schorsch, ARCP's president Kay, to being named as defendants in several federal securities fraud class action lawsuits, various of the Defendants and/or the Company to a federal criminal probe and SEC investigation, and the fact that the Defendants received lucrative bonuses in connection with the Company's deliberate fraud, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

19.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

20.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

23.     Plaintiff is a current shareholder of shares of ARCP with a current aggregate market value of over $50,000.  Plaintiff has been a shareholder of ARCP common stock since before the beginning of the Relevant Period, and has continuously held ARCP common stock at all relevant times.  Plaintiff is a citizen of Florida.

24.     ARCP is a Maryland Corporation and is headquartered at 405 Park Avenue, 12th Floor, New York, New York 10022.  ARCP is one of the country's largest real estate investment trusts ("REIT") and owns many of the buildings that America's most well-known companies operate out of, such as Walgreens, General Electric, Proctor & Gamble, and FedEx.  Ninety percent of the rent that ARCP collects from its tenants is passed on to stockholders.  The adjusted

funds from operations ("AFFO") is a non-U.S. GAAP measure that is an important metric of financial performance of a REIT. Generally, AFFO equals the REIT's funds from operations ("FFO") with adjustments made for recurring capital expenditures that are used to maintain the quality of the REIT's underlying assets or properties. AFFO is a measurement of earnings for the REIT industry.  During the Relevant Period, the Company's stock was listed on the New York Stock Exchange under ticker "ARCP."  ARCP is a citizen of New York and Maryland.

25.     Defendant Nicholas Schorsch ("Schorsch") was the Company's CEO since ARCP's inception until his sudden resignation on October 1, 2014. At all times since ARCP's inception, Schorsch has been the chairman of ARCP's Board of Directors.  Schorsch currently own 3.6 million shares of ARCP, almost 0.4% of the shares outstanding.  During the Relevant Period Schorsch sold 10 million shares of ARCP at artificially inflated prices; indeed, as of April 24, 2014 Schorsch owned 13.6 million shares of ARCP.  Schorsch is also chairman of the board of RCS Capital Corp., of which he owns 19.2 million shares, amounting to about 30% of the outstanding shares.  Schorsch also founded and runs various REITs.  Upon information and belief, Schorsch is a citizen of New York.

26.     Defendant Brian Block ("Block") was the Company's CFO, executive vice president, treasurer, and secretary since before the beginning of the Relevant period until his sudden resignation on October 28, 2014.  Upon information and belief, Block is a citizen of New York.

27.     Defendant Lisa McAlister ("McAlister") was the Company's chief accounting officer and senior vice president since before the beginning of the Relevant period until her

sudden resignation on October 28, 2014.  Upon information and belief, McAlister is a citizen of New York.

28.     Defendant David Kay ("Kay") became the Company's CEO on October 1, 2014, prior to which he was the Company's president at all times during the Relevant Period. Additionally, at all times during the Relevant Period he has been a member of the Company's Board of Directors.  Upon information and belief, Kay is a citizen of New York.

29.     Defendant Lisa Beeson ("Beeson") was appointed the Company's president on October 1, 2014 and has been the chief operating officer of ARCP at all times during the Relevant Period.  Upon information and belief, Beeson is a citizen of New York.

30.     Defendant Leslie D. Michelson ("Michelson") has been a director at ARCP since October 2012. During the Relevant Period, he has been a member of the audit committee, the nominating and governance committee, and the compensation committee.  Upon information and belief, Michelson is a citizen of New York.

31.     Defendant William G. Stanley ("Stanley") has been a director at the Company since October 2009. During the Relevant Period, he has been a member of the audit committee, the nominating and governance committee, and the compensation committee.  Upon information and belief, Stanley is a citizen of New York.

32.     Defendant Bruce D. Frank ("Frank") became a director of ARCP on July 8, 2014. and is a member of the audit committee.  Upon information and belief, Frank is a citizen of New York.

33.     Defendant Scott J. Bowman ("Bowman") was a director at ARCP since February 28, 2013 until his sudden resignation on September 9, 2014. During the Relevant Period until he

resigned as director, he was a member of the audit committee, the nominating and governance committee, and the compensation committee.  Upon information and belief, Bowman is a citizen of New York.

34.     Defendant William Kahane ("Kahane") was a director at ARCP since February 28, 2013 until his sudden resignation on June 24, 2014. He co-founded ARCP with Schorsch. He served as a director of ARCP from December 2010 until March 2012.  He is an officer and director of various REITs and companies affiliated with ARCP.  Upon information and belief, Kahane is a citizen of New York.

35.     Defendant Edward M. Weil, Jr., ("Weil") was a director at ARCP since March 2012 until his sudden resignation on June 24, 2014. Weil served as an executive officer of the Company from December 2010 until January 2014. He is an officer and director of various REITs and companies affiliated with ARCP.  Upon information and belief, Weil is a citizen of New York.

36.     Defendant Scott P. Sealy, Sr., ("Sealy") was a director at ARCP from February 2014 until his sudden resignation on June 10, 2014.  Since October 2008 he was a director of Cole Real Estate Investments, Inc. ("Cole") until Cole was acquired by the Company in February 2014--a deal valued at $11.2 billion. Sealy served as an executive officer of the Company from December 2010 until January 2014. He is an officer and director of various REITs and companies affiliated with ARCP.  Upon information and belief, Sealy is a citizen of Texas.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

37.     By reason of their positions as officers, directors and/or fiduciaries of ARCP and because of their ability to control the business and corporate affairs of ARCP, the Individual

Defendants owed ARCP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ARCP in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ARCP and its shareholders so as to benefit all shareholders equally.

38.     Each director and officer of the Company owes to ARCP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ARCP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     To discharge their duties, the officers and directors of ARCP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ARCP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the ARCP's Board at all relevant times.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing to ARCP to make false and misleading statements of material fact related to their receiving lucrative bonuses, and by not maintaining adequate internal controls.

42.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about the Company's AFFO and net loss, and management bonuses, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing ARCP to make false and misleading statements and omissions of material facts.

43.     To discharge their duties, the officers and directors of ARCP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of ARCP were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, the United States, and pursuant to the ARCP's own Code of Business Conduct and Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how ARCP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of ARCP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ARCP's operations would comply with all laws and ARCP's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

44.     Each of the Individual Defendants further owed to ARCP and the shareholders the duty of loyalty requiring that each favor ARCP's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ARCP and were at all times acting within the course and scope of such agency.

46.     Because of their advisory, executive, managerial, and directorial positions with ARCP, each of the Individual Defendants had access to adverse, non-public information about the Company.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ARCP.

48.     In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of multiple federal securities fraud class action lawsuits, to an SEC investigation, to a criminal probe by the FBI and the U.S. Attorney in New York, to the termination of the sale of assets worth $700 million, to the need to undertake internal investigations, and to losses due to the unjust enrichment of Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses connected to Defendants' false and misleading statements that were made intentionally.  As a result, ARCP has expended, and will continue to expend millions, if not billions, of dollars to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct throughout the Relevant Period. During the Relevant Period, the Individual Defendants caused the Company to conceal the true facts as alleged herein.

50.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (ii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, internal controls, and bonuses provided to employees.

51.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures. Because the actions described herein occurred under the authority of the Board, each of the

Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

53.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ARCP, and was at all times acting within the course and scope of such agency.

<u>CODE OF BUSINESS CONDUCT AND ETHICS
AND AUDIT COMMITTEE CHARTER</u>

54.     Pursuant to the Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

55.     Pursuant to the Audit Committee Charter, the Audit Committee's conduct must comply with the Audit Committee Charter, which sets forth the powers and responsibilities of the Audit Committee.

<u>Code of Business Conduct and Ethics</u>

56.     The Code of Ethics states that it promotes:

•       honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company;
- compliance with applicable governmental rules and regulations; and
- accountability for adherence to this Code.

57.     The Code of Ethics provides, as to "Conflicts of Interest," that:

All directors, officers and employees of the Company should be scrupulous in avoiding any action or interest that conflicts with, or gives the appearance of a conflict with, the Company's interests. A "conflict of interest" exists whenever an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest may also arise when a director, officer or employee or a member of his or her family receives improper personal benefits as a result of his or her position with the Company, whether from a third party or from the Company.

Sometimes, conflicts of interest will develop accidentally or unexpectedly, and the appearance of a conflict of interest can also easily arise. If an employee, officer or director has a conflict, actual or potential, the employee, officer or director should report such conflict to higher levels of management, the board of directors or the Chief Executive Officer. Conflicts of interest may not always be clear-cut, so if a question arises, employees, officers or directors should consult with higher levels of management, the board of directors or the Chief Executive Officer.

Any employee, officer or director that becomes aware of a conflict or potential conflict should bring it to the attention of higher levels of management, the board of directors or the Chief Executive Officer. Such communications will be kept confidential to the extent feasible.

58.     The Code of Ethics provides, as to "Corporate Opportunity," that:

Directors, officers and employees are prohibited from (a) taking for themselves corporate opportunities that properly belong to the Company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the Company. Directors, officers and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

59.     The Code of Ethics provides, as to "Insider Trading," that:

No director, officer or employee who has access to confidential information may use or share that information for stock trading purposes or for any other purpose except the

conduct of our business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. You must always have any sales or acquisitions of the Company's securities pre-approved by the Company's Chief Executive Officer. If you have any questions, please consult the Company's Chief Executive Officer.

60.    The Code of Ethics provides, as to "Public Company Reporting," that:

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission (the "SEC") be accurate, timely and in accordance with all applicable laws and regulations. Depending on their position with the Company, an employee, officer or director may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt accurate answers to inquiries related to the Company's public disclosure requirements. However, no employee, officer or director of the Company should respond to inquiries regarding, or otherwise communicate to any outside party, results, forecasts or trends without the prior approval of the Chief Executive Officer.

61.    The Code of Ethics provides, as to "Financial Statements and Other Records,"

that:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the board of directors.

62.    The Code of Ethics provides, as to "Duty to Report," that:

Employees, officers and directors who suspect or know of violations of this Code or illegal or unethical business or workplace conduct by employees, officers or directors have a duty to report it immediately. Each person is encouraged to report such conduct to a supervisor or superior, but if the individuals to whom such information is conveyed are not responsive, or if there is reason to believe that reporting to such individuals is inappropriate in particular cases, then the employee, officer or director may contact the

Chief Executive Officer of the Company. Such communications will be kept in confidence to the extent appropriate or permitted by law. If the employee is still not satisfied with the response, the employee may contact the Chief Executive Officer, the Chairman of the board of directors or any of the Company's outside directors. While employees, officers and directors are encouraged to use the Company's internal reporting system outlined, above, in all cases, employees, directors and officers may directly report such violations outside the Company to appropriate authorities in accordance with law.

The Company's policy is to comply with all applicable financial reporting and accounting regulations. If any director, officer or employee of the Company has unresolved concerns or complaints regarding questionable accounting or auditing matters of the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Company's audit committee or the Chief Financial Officer. Subject to its legal duties, the audit committee and the Chief Financial Officer will treat such submissions confidentially. Such submissions may be directed to the attention of the Company's audit committee, any director who is a member of the Company's audit committee or the Chief Financial Officer.

Each director, officer and employee who is involved in the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC regulations. Each director, officer and employee who is involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

The Company will make an e-mail address and a telephone hotline available for reporting illegal or unethical behavior as well as questionable accounting or auditing matters and other accounting, internal accounting controls or auditing matters on a confidential, anonymous basis. Any concerns regarding accounting or auditing matters reported via e-mail or to this hotline will be communicated directly to the Chief Executive Officer of the Company.

When reporting a concern, an individual should supply sufficient information so that the matter may be investigated properly. As the ultimate objective of any investigation is to uncover the truth, any employee, officer or director who is found to have lied during an internal investigation will be subject to appropriate discipline, which could include immediate termination without compensation for that act of dishonesty. Full cooperation is expected both from anyone who is suspected or accused of improper conduct and from anyone who makes accusations against somebody else. Any information provided by an employee, officer or director will be handled in a confidential manner to the greatest

extent possible. Moreover, as described below, the Company prohibits retaliation for reporting illegal or unethical behavior.

Any person involved in any investigation in any capacity of a possible misconduct must not discuss or disclose any information to anyone outside of the investigation unless required or permitted by law or when seeking his or her own legal advice, and is expected to cooperate fully in any investigation.

Any use of these reporting procedures in bad faith or in a false or frivolous manner will be considered a violation of this Code. Further, these reporting methods should not be used for personal grievances not involving this Code.

63.    The Code of Ethics provides, as to "Violations," that:

Violation of this Code is grounds for disciplinary action up to and including termination of employment. Such action is in addition to any civil or criminal liability which might be imposed by any court or regulatory agency.

64.    Throughout the Relevant Period, in violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of lucrative bonuses by the Individual Defendants, consciously disregarded their duties to monitor such controls over reporting and engagement in transactions, and consciously disregarded their duties to protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.  The Individual Defendants' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in transactions that were not in the best interest of the Company.

## Audit Committee Charter

65.    At all times during the Relevant Period, Defendants Michelson, and Stanley have served on the Company's audit committee.  Additionally, Defendant Bowman was a member of the audit committee since the beginning of the Relevant Period until he resigned on September 9, 2014.  After Defendant Frank became a director on July 8, 2014, he became a member of the audit committee.  Michelson is the chairman of the audit committee.

66.    The purpose of the Company's Audit Committee is to:

1. oversee the accounting and financial reporting process of the Company and the audits of the financial statements of the Company;

2. appoint, retain and oversee the work of any independent registered public accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditor"), and determine the compensation of the Independent Auditor; and

3. monitor the integrity of the Company's financial statements, the Independent Auditor's qualifications and independence, the performance of the Company's internal audit function, the Company's compliance with legal and regulatory requirements and the Company's overall risk profile.

The Committee shall have all of the powers of the Board that are necessary or appropriate for the Committee to fulfill its purposes and carry out its duties and responsibilities as set forth in this Charter. In addition, the Committee may exercise any other powers and carry out any other responsibilities delegated to it by the Board from time to time consistent with the Company's Bylaws.  The powers and responsibilities delegated by the Board to the Committee in this Charter or otherwise shall be exercised and carried out by the Committee as it deems appropriate without requirement of further Board approval, and any decision made by the Committee (including any decision to exercise or refrain from exercising any of the powers delegated to the Committee hereunder) shall be at the Committee's sole discretion.

The Committee shall have the sole and exclusive authority, as it deems appropriate, to retain and/or replace, as needed, any independent counsel, compensation and benefits consultants and other outside experts or advisors as the Committee believes to be desirable or appropriate, including the sole authority to retain and/or replace the Independent Auditor. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the Independent Auditor and any

other persons employed by the Committee and for ordinary administrative expenses of the Committee that are desirable or appropriate in carrying out its duties. The Committee may also utilize the services of the Company's regular legal counsel or other advisors to the Company.

67.     Throughout the Relevant Period, in violation of the Audit Committee Charter, the Individual Defendants who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and of the Company's engagement in a scheme to conceal the Defendants' violations of the federal securities laws in connection with the Defendants' receipt of bonuses from the Company, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme to conceal the fraud, and consciously disregarded their duties to ensure that they and other officers, directors, and employees of ARCP protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, and avoid conflicts of interest. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in a scheme that was not in the best interest of the Company.

## DEFENDANTS' MISCONDUCT

68.     On October 29, 2014, ARCP announced that its financial statements filed with the SEC in its annual report on Form 10-K for the fiscal year ending December 31, 2013 (the "2013 10-K") and the quarterly financial statements on Form 10-Q for first and second quarters of 2014 (the "1Q 2014 10-Q" and "2Q 2014 10-Q," respectively) could no longer be relied upon by investors and need to be restated.

69.     ARCP disclosed that a mistake was made in accounting for AFFO in the financial statements for the first quarter of 2014, and admitted that the financial statements for the second

quarter of 2014 were misstated intentionally in order to conceal the "mistake" made in the first quarter's financial statements.

70.     The accounting misstatements resulted in an overstatement of the Company's AFFO and understatement of the Company's net loss for the first quarter and first half of 2014.

71.     The restatement will end up reducing ARCP's AFFO by $12 million for the first quarter of 2014 and $10.9 million for the second quarter of 2014.

72.     The 2013 10-K, which ARCP filed with the SEC on February 27, 2014, falsely stated that the AFFO amount was $163,915,000 for the year ending December 31, 2013.

73.     The 2013 10-K also falsely stated under "Controls and Procedures" that:

**Disclosure Controls and Procedures**

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

***Management's Annual Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. as defined in Rule 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 1992 Internal Control-Integrated Framework.

\*\*\*\*

Based on our assessment, our management believes that, as of December 31, 2013, our internal control over financial reporting is effective.

\*\*\*\*

***Changes in Internal Control over Financial Reporting***

During the fourth quarter of fiscal year ended December 31, 2013, there were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

74. The 2013 10-K was signed by Defendants Schorsch, Beeson, Kay, Block, McAlister, Michelson, Stanley, Bowman, and Sealy.

75. Accompanying the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Schorsch and Block attesting to their accuracy.

76. The 1Q 2014 10-Q, which ARCP filed with the SEC on May 8, 2014, falsely stated that the AFFO amount was $147,389,000 for the first quarter of 2014.

77. ARCP's 1Q 2014 10-Q also falsely stated under "Controls and Procedures" that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

- 23 -

No change occurred in our internal controls over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act) during the three months ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

78.    The 1Q 2014 10-Q was signed by Defendants Schorsch and Block.

79.    Accompanying the 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and the SOX signed by Defendants Schorsch and Block attesting to their accuracy.

80.    The 2Q 2014 10-Q, which ARCP filed with the SEC on July 29, 2014, falsely stated that the AFFO amount was $205,278,000 for the previous three months and $353,058,000 for the previous six months ending on June 30, 2014.

81.    ARCP's 2Q 2014 10-Q also falsely stated under "Controls and Procedures" that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

No change occurred in our internal controls over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act) during the six months ended June 30, 2014 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

82.    The 2Q 2014 10-Q was signed by Defendants Schorsch and Block.

83.    Accompanying the 2Q 1014 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 and SOX signed by Defendants Schorsch and Block attesting to their accuracy.

84.     On October, 29, 2014, the same day that ARCP publicly announced that its management's deliberate fraud, the Wall Street Journal reported that the SEC plans to investigate ARCP's accounting irregularities.

85.     The same day, Analysts at each of Wells Fargo, Bank of America, Ladenburg Thalmann and Stifel, Nicolaus & Co. suspended their coverage or rating of ARCP.

86.     Wells Fargo thus noted to its clients that day:  "Our current policy is that we will suspend research coverage when the analyst is unable to support or sustain his/her existing valuation, estimates, or recommendation due to various legal, regulatory or policy circumstances."

87.     The next day, October 30, 2014, Bloomberg reported that Standard & Poor's may cut ARCP's credit rating to junk status.

88.     On October 31, 2014, Reuters reported "U.S. authorities have opened a criminal probe of American Realty Capital Properties in the wake of the real estate investment trust's disclosure that it had uncovered accounting errors, two sources familiar with the matter said on Friday.  The Federal Bureau of Investigation is conducting the investigation along with prosecutors from U.S. Attorney Preet Bharara's office in New York..."

89.     Prior to public disclosure of ARCP management's fraud, RCS had agreed to purchase Cole Capital Advisors Inc. for $700 million.  As a result of news of the fraud, RCS disclosed that it would no longer make that purchase.

90.     On November 3, 2014, the Wall Street Journal reported that because various large brokerages would no longer sell Schorsch's non-traded REITs due to exposure of the ARCP fraud, investors in RCS deemed Cole Capital Advisors Inc. to be less valuable.

91.    RCS thus stated:   "RCAP has moved swiftly and decisively to protect its franchise, the interests of its shareholders and the ongoing prospects and continuing enterprise value of the company and its subsidiaries."

92.    RCS cancelled its purchase of Cole Capital Advisors Inc. despite that ARCP stated that RCS's decision not to buy Cole is a breach of their agreement.

93.    Indeed, on November 11, 2014, ARCP filed a complaint in the Court of Chancery of the State of Delaware against RCS based on RCS's alleged breach of the acquisition agreement.

94.    On November 10, 2014 the Wall Street Journal reported in an article entitled "American Realty Capital Accounting Errors Tied to Employee Bonuses" that Rendell, former Pennsylvania Governor, stated that ARCP's financial statements that needed to be restated were "incorrect because [executives] fudged something about bonuses to cover up a prior mistake."

95.    The Wall Street Journal in that November 10 article that the "accounting errors resulted from incorrect accruals related to bonus payments made across a broad swath of the company, including to management, according to a person familiar with the matter."

96.    Shortly before the ARCP fraud became public, on June 10, 2014 Defendant Sealy resigned as Company director, on June 24, 2014 Defendants Kahane and Weil resigned as Company directors, and on September 9, 2014 Defendant Bowman resigned as Company director.

97.    On October 1, 2014, Defendant Schorsch resigned as the Company's CEO.

98.    Additionally, on the same day the ARCP fraud was disclosed to the public, on October 29, 2014, the Company announced that, on October 28, 2014, at the request of ARCP's

audit committee, Defendant Block resigned as the Company's CFO, executive vice president, treasurer, and secretary and Defendant McAlister resigned as the Company's chief accounting officer and senior vice president.

99.     The price of ARCP stock, plummeted from the closing price of $12.38 on October 28, 2014 to close at $8.79 per share on November 12, 2014.

100.     Thus, ARCP's stock price has fallen nearly 30%, wiping out approximately $4 billion in market value.

## DAMAGES TO ARCP

101.     As a direct and proximate result of the Individual Defendants' conduct, ARCP has lost and has expended and will continue to expend millions, if not billions, of dollars.

102.     Such expenditures include, but are not limited to, legal fees associated with the multiple federal securities fraud class action lawsuits filed against the Company and its management, an SEC investigation, a criminal probe by the FBI and the U.S. Attorney in New York, and to internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection with the investigations and lawsuits.

103.     Such losses include those due to the unjust enrichment of Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses connected to Defendants' false and misleading statements that were made intentionally, and losses from the termination of the sale to RCS of ARCP's assets worth $700 million.

104.     As a direct and proximate result of the Individual Defendants' conduct, ARCP has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

105.    Plaintiff brings this action derivatively and for the benefit of ARCP to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of ARCP, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

106.    ARCP is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107.    Plaintiff is, and at all relevant times has been, an ARCP shareholder.  Plaintiff will adequately and fairly represent the interests of ARCP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

109.    A pre-suit demand on the Board of ARCP is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Thomas A. Andruskevich ("Andruskevich"), who has been a director of the Company since February 2014, and the following Individual Defendants: Schorsch, Kay, Michelson, Stanley, and Frank (collectively, the "Current Directors").  Plaintiff needs only to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

110.    Defendant Schorsch, as the Company's chairman and CEO during the Relevant Period, and Defendant Kay as the Company's current CEO and, before that, president, during the Relevant Period, are thus non-independent directors.  They were ultimately responsible for the Company's operations, internal controls, and false and misleading statements and omissions that were made during the Relevant Period.  Additionally, Schorsch signed, not only the 2013 10-K, but the 1Q 2014 10-Q and 2Q 2014 10-Q, each of which contained the false and misleading statements of material fact.  In complete abdication of their fiduciary duties, Schorsch and Kay participated in the fraudulent scheme to make the Company appear more profitable and attractive to investors and to cover-up the Defendants' deliberate accounting fraud connected to the receipt of lucrative bonuses by Defendants and ARCP's employees.  As a result, Schorsch and Kay breached their fiduciary duties.  Thus Schorsch and Kay face a substantial likelihood of liability, and demand upon them is futile and, therefore, excused.

111.    Likewise, Defendants Michelson, and Stanley, and Frank, as members of the Audit Committee during the Relevant Period, acted in violation of the Audit Committee Charter, as they conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of lucrative bonuses by the Individual Defendants, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and ARCP's and Defendants' engagement in conduct that was not in the best interest of the

Company.  Thus, Defendants Michelson, and Stanley, and Frank face a substantial likelihood of liability for their breach of fiduciary duties.  Because these Defendants face a substantial likelihood of liability, any demand upon them is futile.

112.    Demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned lack of oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the scheme to make false and misleading statements in connection with the receipt of lucrative bonuses by the Individual Defendants, *including by each of the Current Directors themselves*, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

113.    Moreover, as stated herein, all but one of the Current Directors (Defendant Frank), Defendants Schorsch, Kay, Michelson, Stanley, and Andruskevich, signed the Company's 2013 10-K.  Accordingly, the Current Directors face a substantial likelihood of liability for directly making and approving the false and misleading statements of material fact contained therein.  As a result, any demand upon them is futile and thus excused.

114.    In complete abdication of their fiduciary duties, all of the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to make the Company appear more profitable and attractive to investors, and to increase the Company stock price.  As a result, the Current Directors breached their fiduciary duties.  Thus, the Current Directors face a substantial likelihood of liability, and demand upon them is futile.

115.    The Current Directors, as members of the board, were and are subject to the Code of Ethics.  The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Current Directors to also adhere to ARCP's standards of business conduct.  The Current Directors did not comply with the requirements of the Code of Ethics.  The Current Directors violated the Code of Ethics by causing the Company to fail to maintain adequate internal controls, to make false and misleading statements and omissions of material fact, and to engage in the scheme to make false and misleading statements in connection with the receipt of lucrative bonuses by the Individual Defendants.  Because the Current Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

116.    Furthermore, demand in this case is excused because the Current Directors, who are named as defendants in this action, control the Company and are beholden to each other, especially to Defendants Schorsch and Kay.

117.    Members of the board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the board from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Current Directors would be futile.

118.    ARCP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct that has been engaged in for almost a year to attempt to recover for ARCP any part of the damages ARCP suffered and will continue to suffer thereby.  Thus, any demand on the Current Directors would be futile.

119.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

120.    The acts complained of herein constitute violations of fiduciary duties owed by ARCP's officers and directors and these acts are incapable of ratification.

121.    The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of ARCP.  If there is a directors' and officers' liability insurance policy covering the Current Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Current Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Current Directors were to sue themselves or certain of the officers of ARCP, there would be no directors' and officers' insurance protection.  Accordingly, the Current Directors cannot be expected to bring such a suit.

On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Current Directors is futile and, therefore, excused.

122.     If there is no directors' and officers' liability insurance, then the Current Directors will not cause ARCP to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

123.     Thus, for the reasons set forth above, all of the Current Directors, and, if not all of them, certainly a majority of the Current Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Current Directors is excused as futile.

124.     Overall, the Company has and will expend millions, if not billions, of dollars in legal fees associated with multiple federal securities fraud class action lawsuits, to an SEC investigation, to a criminal probe by the FBI and the U.S. Attorney in New York, and internal investigations, and has suffered huge losses due to the termination of the Company's sale to RCS of assets worth $700 million and to the unjust enrichment of Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses connected to Defendants' false and misleading statements that were made intentionally.  The Company has otherwise also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.  Moreover, the Company's reputation has been severely damaged.  Additionally, the Company's market capitalization has been diminished by almost four billion dollars.  All of this substantial damage to ARCP stems proximately from the

Current Directors' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ARCP's business and affairs.

127.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

128.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ARCP.

129.    In breach of their fiduciary duties owed to ARCP, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee ARCP's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

130.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.  Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ARCP's securities and disguising self-dealing transactions.

131.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in illicit mortgage-servicing practices, and fail to maintain adequate internal controls.  Defendants had actual knowledge that the Company was improperly engaging in illicit mortgage-servicing practices, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the scheme to make the Company appear more profitable and attractive to investors and to cover-up the Defendants' deliberate accounting fraud connected to the receipt of lucrative bonuses by Defendants and ARCP's employees, and fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ARCP's securities and engaging in self-dealing transactions.

132.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

133.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ARCP has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

**Against Individual Defendants for Abuse of Control**

134.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

135.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ARCP, for which they are legally responsible.

136.    As a direct and proximate result of the Individual Defendants' abuse of control, ARCP has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, ARCP has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

**Against Individual Defendants for Gross Mismanagement**

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ARCP in a manner consistent with the operations of a publicly-held corporation.

139.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ARCP has sustained and will continue to sustain significant damages.

140.    As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

141.    Plaintiff, on behalf of ARCP, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

143.    By their wrongful acts and the omissions of material fact that they caused to be

made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment

of, ARCP.

144.    During the Relevant Period, the Individual Defendants either benefitted

financially from the improper conduct and received unjustly lucrative bonuses tied to the false

and misleading statements, or received bonuses, stock options, or similar compensation from

ARCP that was tied to the performance or artificially inflated valuation of ARCP, or received

compensation that was unjust in light of the Individual Defendants' bad faith conduct.

145.    Plaintiff, as a shareholder and a representative of ARCP, seeks restitution from

the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and

other compensation, including any performance-based or valuation-based compensation,

obtained by the Individual Defendants due to their wrongful conduct and breach of their

fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of ARCP, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ARCP;

(c)    Determining and awarding to ARCP the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing ARCP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ARCP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of ARCP to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding ARCP restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2014   Respectfully submitted,

        **THE BROWN LAW FIRM**

By:

        Timothy W. Brown, Esq. (TB 1008)
        Email: tbrown@thebrownlawfirm.net
        127A Cove Road
        Oyster Bay Cove, New York 11771
        Telephone: (516) 922-5427

        *Counsel for Plaintiff*

## VERIFICATION

I, Jeffrey Turner, as a trustee of the Michele Graham Turner 1995 Revocable Trust, am the plaintiff in the within action and am a citizen of the Florida. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 17th day of November 2014.

Jeffrey Turner, as a trustee of the Michele Graham 1995 Revocable Trust